**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**JOHNNY M. RUFFIN, JR.,**

 **Plaintiff,**

**v.**

**WINNEBAGO COUNTY JAIL, et al.,**

 **Defendants.**       **Case No.  03-cv-210-DRH**

## MEMORANDUM & ORDER

**HERNDON, Chief Judge:**

## I.  INTRODUCTION

Pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 56**, two related and similar motions for summary judgment are before the Court, along with supporting briefs and exhibits.  (Docs. 142, 143, 149 and 150).  The following Defendants join in the subject motions: the Illinois Department of Corrections (IDOC), Alan Frentzel, Mavis Gross, Pam Grubman, Gary Knop, Tyrone Murray, Elisa Rea, Roger Cowan, Guy Pierce, Christine Mitchell (now Brown), Donald Snyder and Scott Wyciskalla. Plaintiff Johnny Ruffin has filed a combined Response, competing statement of uncontested facts, memorandum and exhibits, and supplemental affidavit.  (Docs. 173 (including subparts 2-4), and Doc. 181).

Plaintiff Johnny Ruffin is in the custody of the Illinois Department of Corrections.  Plaintiff is a paraplegic, permanently confined to a wheelchair.  Eight bullets remain in plaintiff's body and he has right-side paralysis, problems with his bowels, muscle spasms and persistent urinary tract problems.  The events at issue occurred at Pinckneyville Correctional Center, during the period between April 6, 2000 through February 6, 2001, and at Menard Correctional Center during the period between February 2001 and December 2002.

The motions for summary judgment pertain to the following claims (with the movants' names emboldened):

**COUNT 5:**  Against defendants Garcia, **Murray**, **Pierce**, McKinney, **Mitchell**, **Snyder**, **Wcyiskalla**[1], and John Doe for deliberate indifference to plaintiff's serious medical needs, in violation of his rights under the Eighth Amendment while he was at Pinckneyville Correctional Center (Doc. 1, ¶¶ 42-92).

**COUNT 7:** Against defendants **Pierce**, Garcia, **Mitchell**, McKinney, **Wcyiskalla**, **Snyder**, **Murray**, and Doe for reckless negligence under the laws of the State of Illinois (Doc. 1, ¶ 94).

**COUNT 9:**  Against defendants McKinney, Garcia, Williams, and **Wcyiskalla** for retaliation and harassment (Doc. 1, ¶¶ 100-121).

**COUNT 11:** Against defendants Feinerman, **Gross**, **Cowan**, Walls, **Grubman**, **Snyder**, **Frentzel**, and Doughty for deliberate indifference to plaintiff's serious medical needs, in violation of his rights under the Eighth Amendment (Doc. 9, ¶¶ 139-183).

**COUNT 13:** Against defendants Feinerman, Doughty, Walls, **Cowan**, **Frentzel**, **Grubman**, **Gross**, and **Snyder** for reckless negligence under the laws of the State of Illinois (Doc 9, ¶ 185).

---

[1]  Defendant Scott Wyciskalla's last name is misspelled in the complaint as "Wcyiskalla.**"**

**COUNT 16:** Against defendants **Snyder**, **Cowen**, Walls, Feinerman, **Grubman**, **Frentzel**, **Knop**, **Rea** and the **IDOC** for violations of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. (Doc. 1, ¶¶ 207-215; Doc. 118, pp. 8-10).

**COUNT 17:** Against defendants **Rea**, West, **Cowen**, and Walls for retaliation and harassment (Doc. 1, ¶¶ 216-227).

(Docs. 1, 9, 21 and 118).

## II.  BACKGROUND FACTS

Although the parties submitted competing statements of fact, there is very little disagreement.  (*See* Doc. 173-2, p. 1, ¶ 1).  The following basic factual framework is drawn not only from the documents submitted in support of the subject motions but, in order to present a broader overview of the claims, also from documents submitted in support of co-defendants Garcia, Feinerman and Doughty's motion for summary judgment (Doc. 136).

### Pinckneyville Correctional Center April 6, 2000 - February 6, 2001

After being shot in 1999, Plaintiff was treated at the Swedish American Hospital.  When Plaintiff was discharged to Dixon Correctional Center, his treating physician, Dr. Jamil Hussain, and the physician in charge of Plaintiff's physical therapy, Dr. Scott Craig, recommended four to six weeks of additional physical therapy. (Doc. 159-2, p. 11; Doc. 150-4, p. 11).   Plaintiff was given physical therapy while housed at Dixon Correctional Center; he was also prescribed Baclofen, a muscle relaxer and antispastic agent.   However, the transfer sheet sent to Pinckneyville Correctional Center did not list Baclofen.  Weekly physical therapy was

listed under "Follow-up Care" on the transfer sheet. (Doc. 199-4, p. 15). Upon Plaintiff's arrival at Pinckneyville, Dr. Garcia renewed the medications on the transfer sheet, which did not include Baclofen. Plaintiff went without Baclofen from April 7 through April 25, 2000, at which point Dr. Garcia prescribed Baclofen. After the initial prescription ran out, Plaintiff was not prescribed Baclofen between June 26 and August 3, 2000.

According to Plaintiff's affidavit, in June 2000, he made a verbal complaint to Pinckneyville Assistant Warden Karen McKinney about being denied previously prescribed medical treatment and physical therapy, as there was no therapist on staff. (Doc. 181, p. 1). McKinney purportedly characterized Plaintiff as being a litigious "troublemaker," commenting that she would ensure her officers made the life of any troublemaker a living hell.

Dr. Garcia prescribed Baclofen again on August 3, 2000 for a one month period, and on September 3. 2000, he renewed the prescription through December 31, 2000. (Doc. 138-8, p. 8; Doc. 138-7, p. 5). However, Dr. Garcia states that on October 16, 2000, Plaintiff refused to take Baclofen and demanded the prescription be discharged, so Garcia discontinued the prescription on October 20th and did not reinstate it until November 10, 2000, when Plaintiff again requested Baclofen. (Doc. 138-7, pp. 5-6). According to Plaintiff, Dr. Garcia deliberately discontinued the medication between October 16 and November 10, 2000, knowing Plaintiff was experiencing muscle spasms. (Doc. 171, p. 8). Medical notes dated October 16,

2000 reflect that Plaintiff refused Baclofen. (Doc. 159-4, p. 19). Plaintiff explains that he missed the October 16th med-line, due to a knee injury – implying he would have requested renewal of the prescription, and evincing that he did not affirmatively demand the prescription be discontinued. (Doc. 159, pp. 15-16). According to Plaintiff's affidavit, he asked defendant Correctional Officer Scott Wyciskalla for an ADA attendant to assist him out of bed and to get his medication, but he received no assistance; instead, Wyciskalla issued Plaintiff a false disciplinary ticket. (Doc. 181, p. 2). Inmate Upchurch's affidavit also indicates that Plaintiff missed the medical call line on October 16, 2000 because a correctional officer would not assist Plaintiff into his wheelchair. (Doc. 159-3, p. 34).

Plaintiff acknowledges that on April 18, 2000, Dr. Garcia referred Plaintiff to a prosthesis specialist for a new hand brace, but Plaintiff alleges that in retaliation for filing grievances, Dr. Garcia failed to ensure Plaintiff received the prosthesis, which he finally received on September 28, 2000.

Plaintiff also takes issue with receiving physical therapy during the first four months he was at Pinckneyville, between April and August, 2000, due to there being a physical therapist vacancy at the facility. Plaintiff was not sent off-site for therapy, but once a therapist was hired, Plaintiff received therapy until January 29, 2001, when he was placed in segregation after a disciplinary conviction for fashioning a shank out of part of his prosthesis. Just prior to that time, on January 18, 2001, Plaintiff's physical therapy had been decreased to three times per week. (Doc. 159-5, p. 14). Plaintiff did not receive therapy from January 29 through

February 6, 2001, when he was transferred to Menard Correctional Center. The transfer sheet reflects that Plaintiff's treatment plan included physical therapy and a right hand brace. (Doc. 159-5, p. 16).

In October 2000, attorney Barry G. Lowy wrote to Warden Guy Pierce about Plaintiff's ADA rights and related grievances tied to Plaintiff's medical care or lack thereof. (Doc. 173-4, pp. 14-15). According to Plaintiff's affidavit, Lowy told Plaintiff he had spoken to Warden Pierce, Assistant Warden McKinney and an unspecified IDOC deputy. (Doc. 181, p. 1).

### Menard Correctional Center, February 6, 2000–December 6, 2002

Menard Correctional Center never employed a physical therapist on its staff during the time while Plaintiff was housed there, but if therapy had been deemed medically necessary, arrangements could have been made. (Doc. 159-2, p. 15). According to the affidavit of Health Care Unit Administrator Pam Grubman, however, a physical therapist aide was on staff, so had there been a medical order for physical therapy, it would have been provided. (Doc. 143-4, p. 2). Plaintiff contends that his documented history of physical therapy illustrates that therapy was medically necessary. Upon arrival at Menard, Dr. McEntyre examined Plaintiff and continued Plaintiff's treatment plan, which included the use a right arm brace, egg crate mattress and wheelchair. (Doc. 159-2, p. 14). However, relative to physical therapy, Dr. McEntyre noted that Plaintiff's physical therapist had indicated Plaintiff should just continue performing exercises he had already been taught. (Doc. 159-5, p. 18).

During Plaintiff's first night at Menard, while in the Health Care Unit, Plaintiff was apparently permitted to use an egg crate mattress, but not thereafter. (Doc. 159-5, pp. 20 and 22). On February 21, 2001, two weeks after arriving at Menard, Plaintiff complained of bed sores and asked for an egg crate mattress. (Doc. 159-5, p. 23). Records reflect that, because no bed sores were found, an egg crate mattress would have no therapeutic value and was not authorized; in addition, egg crate mattresses are considered a fire hazard at Menard. (Doc. 159-6, p. 28). Medical records show that Plaintiff specifically asked Dr. Feinerman for an egg crate mattress, but not Dr. Doughty. (Doc. 138-9 and Doc. 138-11). According to Plaintiff and inmate Dennis Thomas, inmate Craig Childress was permitted to possess two egg crate mattresses. (Doc. 159-3, p. 17). According to Plaintiff, Drs. Feinerman and Doughty approved Childress's possession of the mattress. Both doctors indicate they did not observe any signs or symptoms of bedsores on Plaintiff; therefore, there was no medical need for an egg crate mattress. (Doc. 138-9 and Doc. 138-11).

Plaintiff was never authorized for any specific on-site physical therapy program or off-site program during his time at Menard, despite Plaintiff's requests and grievances. Dr. Feinerman found physical therapy was not medically necessary. (Doc. 159-6, p. 23). On December 3, 2001, Plaintiff asked Dr. Doughty for physical therapy; Dr. Doughty noted that physical therapy was not indicated, per Dr. Feinerman and also stated in his affidavit that he did not find Plaintiff's need to be acute. (Doc. 138-12, p. 14). In December 2001, when Dr. Anyanwu took over as Medical Director, he concluded: "Physical therapy now may not be very helpful

however [patient] can do self exercises." (Doc. 159-6, p. 14). However, Plaintiff and inmate Glenn Smith state that Dr. Feinerman explained to Plaintiff that, had Plaintiff not gotten a disciplinary report and consequently transferred to Menard, Plaintiff would still be receiving physical therapy. (Doc. 159-3, p. 30). Furthermore, Smith recounts that when Plaintiff told Dr. Feinerman he needed physical therapy and an egg crate mattress, Dr. Feinerman told Plaintiff, "You need a new spinal cord too." (Doc. 159-3, p. 30). Both doctors state that they have no power over the hiring of a physical therapist and, in light of Menard's maximum security status, absent an acute need for physical therapy, an inmate would not be taken off-site for physical therapy. (Doc. 138-9 and Doc. 138-11).

In April 2001, Plaintiff approached Paralegal Assistant Elisa Rea in connection with litigation he was pursuing against officials at Pinckneyville Correctional Center. (Doc. 181, p. 2). According to Plaintiff, approximately a week later Rea told Plaintiff she had heard from someone named Colleen that he was a troublemaker, and she remarked that troublemakers get what they have coming to them. (Doc. 181, p. 2). In the weeks and months to come, Rea denied Plaintiff's requests for supplies and assistance needed to pursue Plaintiff's grievances and litigation. (Doc. 181, pp. 2-4). According to Plaintiff, Rea made an assortment of comments reflecting that she was "not in the business of giving legal supplies" and she was sick and tired of Plaintiff filing grievances against her, and also threatening to make a disciplinary charge that could cost Plaintiff his television privileges. (Doc. 181, pp. 2-4).

Plaintiff attests that on August 8, 2001, he personally spoke to IDOC Director Donald Snyder, Deputy Director DeTella, Warden Jonathan Walls, Assistant Warden Frentzel and Superintendent Martin, complaining that he was being denied prescribed medical treatment and physical therapy, and being retaliated against by Paralegal Assistant Rea. (Doc. 181, p. 3). According to Plaintiff, he also gave Director Snyder copies of his grievances. (Doc. 181, p. 3).

Plaintiff further attests that his handicapped status was not fully accommodated at Menard Correctional Center. Plaintiff contends: he was not provided a wheelchair-accessible van for transport to and from court and for transfers, suffering injuries as a result; the segregation yard did not have a wheelchair-accessible restroom; the non-contact visiting room was not wheelchair-accessible; and the fire evacuation plan for wheelchair-bound inmates places them in greater danger than other inmates. (Doc. 181, pp. 4-5).

### III.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 396 (7th Cir. 2000).** In determining the existence of a genuine dispute of material fact, the Court construes all facts in the light most favorable to

the nonmoving party and draws all reasonable inferences in favor of that party. ***See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath,* 211 F.3d at 396.** If the moving party meets its burden, the nonmoving party has the burden "to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." ***Borello v. Allison,* 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex,* 477 U.S. at 322-26; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996).** A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," ***Anderson,* 477 U.S. at 247**, or by "some metaphysical doubt as to the material facts," ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)**. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." ***Anderson,* 477 U.S. at 252; *Insolia v. Phillip Morris Inc.,* 216 F.3d 596 (7th Cir. 2000).**

## IV. <u>ANALYSIS</u>

In sum, Defendants argue:

1.   Plaintiff failed to prove an Eighth Amendment violation for deliberate indifference towards Plaintiff's medical care.

2.   Plaintiff's claims under Illinois state law are barred by sovereign immunity.

3.   Plaintiff failed to prove the Defendants violated Section 504 of the Rehabilitation Act of 1973.

4.      Plaintiff failed to prove that he was retaliated against or harassed by Defendants.

5.      Plaintiff failed to prove the personal involvement of defendant Snyder.

6.      Defendants are entitled to qualified immunity.

7.      Plaintiff's claims against the Defendants in their official capacity are barred by the Eleventh Amendment.

## A.    Eighth Amendment Claims

Counts 5 and 11 allege certain Defendants were deliberately indifferent to Plaintiff's serious medical needs. Count 5 pertains to the time period Plaintiff was housed at Pinckneyville Correctional Center, April 6, 2000 through February 6, 2001, and is specific to defendants Warden Guy Pierce, Health Care Administrator Christine Mitchell Brown, Correctional Officer Scott Wyciskalla and Leisure Time Activity Specialist Tyrone Murray, as well as IDOC Director Donald Snyder. Count 11 pertains to the time period Plaintiff was housed at Menard Correctional Center, February 6, 2000 through December 6, 2002, and is specific to defendants Warden Roger Cowan, Assistant Warden Alan Frentzel, Health Care Unit Administrator Pam Grubman and Correctional Clerk Mavis Gross, as well as IDOC Director Donald Snyder.

Generally, the Eighth Amendment obligates prison officials to "provide humane conditions of confinement; . . . [to] ensure that inmates receive adequate food, clothing, shelter and medical care, and [to] 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, **511 U.S. 825, 834**

(1994); *see also Estelle v. Gamble*, **429 U.S. 97 (1976).**  The Eighth Amendment is violated when an official exhibits "deliberate indifference"--when an official "knows of and disregards an excessive risk to inmate health or safety[;] the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, **511 U.S. at 837.**  This standard is subjective, and is the equivalent of recklessness in the criminal law sense.  *Id.*

Mere negligence will not create liability, nor will the provision of medical treatment other than that preferred by the inmate. *Estelle*, **429 U.S. at 107;** *Burns v. Head Jailor*, **576 F. Supp. 618 (N.D. Ill. 1984).**  Also, delay in providing medical care may be sufficient for liability. *Kelley v. McGinnis*, **899 F.2d 612 (7th Cir. 1990).**  A difference of medical opinion or even a showing of medical malpractice does not alone suffice. *See Estate of Cole Pardue v. Fromm,* **94 F.3d 254, 256 (7th Cir. 1996).**  An objective analysis from the standpoint of a "reasonable doctor" is not applicable in the Eighth Amendment context; *Farmer* dictates the use of a subjective standard. *Steele v. Choi*, **82 F.3d 175, 179 (7th Cir. 1996).**

In a civil rights suit such as this, **42 U.S.C. §1983** requires a Plaintiff to show "(1) an action taken under color of law (2) which violates his federal constitutional rights." *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, **924 F.2d 106, 107 (7th Cir. 1991).** *Wolf-Lillie v. Sonquist*, **699 F.2d 864, 869**

**(7th Cir.1983)**, stresses that "Section 1983 creates a cause of action based upon personal liability and predicated upon fault.  An individual cannot be held liable in a [Section] 1983 action unless he caused or participated in an alleged constitutional deprivation."  *See also McBride v. Soos*, **679 F.2d 1223, 1227 (7th Cir.1982).**  Therefore, each Defendant will be addressed in turn.

### 1.     Donald Snyder

According to Plaintiff, Donald Snyder, as Director of the Illinois Department of Corrections, was aware of Plaintiff's grievances and letters regarding his medial care at Pinckneyville Correctional Center, and Snyder had authority to take action to ensure Plaintiff received proper medial care, but Snyder did nothing. (*See* Doc. 143-2, pp. 5, 7-8 ).  In addition, Plaintiff attests that on August 8, 2001, he personally spoke to Snyder, complaining that he was being denied prescribed medical treatment and physical therapy.  (Doc. 181, p. 3).  According to Plaintiff, he also gave Director Snyder copies of his grievances.  (Doc. 181, p. 3).

Director Snyder counters that he lacked any personal involvement in Plaintiff's medical care.  The affidavit of Jackie D. Miller, IDOC Administrative Review Chairperson, indicates records do not reflect that Director Snyder reviewed any of Plaintiff's grievances regarding his medical care; rather, a designee would have signed the grievances.  (Doc. 143-3, pp. 2-3).  Snyder does not offer his own affidavit or deposition testimony.  "The doctrine of respondeat superior does not apply to § 1983 actions; thus to be held individually liable, a defendant must be 'personally

responsible for the deprivation of a constitutional right." ' *Sanville v. McCaughtry,* *266 F.3d 724, 740 (7th Cir. 2001), quoting Chavez v. Ill. State Police,* **251 F.3d 612, 651 (7th Cir. 2001); *see also Monell v. Department of Social Services,* 436 U.S. 658 (1978); *Eades v. Thompson,* 823 F.2d 1055, 1063 (7th Cir. 1987); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 867 (7th Cir. 1983); *Duncan v. Duckworth,* 644 F.2d 653, 655-56 (7th Cir. 1981).** A director of a state correctional agency is not personally responsible for constitutional violations within prison system *solely* because the grievance procedure made him aware of it and he failed to intervene. *Crowder v. Lash,* **687 F.2d 996, 1006 (7th Cir. 1982).** However, supervisory officials may be liable for the constitutional torts of their subordinates *if* the supervisor knows of and facilitates, approves, condones, or turns a blind eye to the conduct. *Chavez v. Cady,* **207 F.3d 901, 906 (7th Cir. 2000); *Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir. 1988).**

Plaintiff concedes Snyder is not a medical professional who can make decisions about medical treatment. (Doc. 173-2, p. 2). However, it is Plaintiff's contention that administrative officials – Director Snyder first and foremost – should have hired qualified medical staff, or altered policies to permit Plaintiff to receive outside treatment. (*See* Doc. 173-2, pp. 2-3). The causal connection suggested by Plaintiff is far too attenuated for Eighth Amendment liability to attach. Negligent hiring practices and/or policy decisions are insufficient to sustain Eighth Amendment liability. Furthermore, there is no evidence that Plaintiff brought these hiring issues

to Snyder's attention and linked them to his allegedly deficient medical care.[2] Therefore, defendant Snyder is entitled to summary judgment on Counts 5 and 11.

### 2.    Guy Pierce

Guy Pierce is the warden at Pinckneyville Correctional Center.  As Plaintiff argued relative to Director Snyder, Plaintiff contends Warden Pierce, although not a medical professional, had authority to make staffing changes and related decisions that could have ensured Plaintiff received needed medical care and physical therapy from qualified professionals.  (Doc. 143-2, pp. 7-8; Doc. 173-2, pp. 2-4).

In October 2000, attorney Barry G. Lowy wrote to Warden Guy Pierce about Plaintiff's ADA rights and related grievances tied to Plaintiff's medical care or lack thereof.  (Doc. 173-4, pp. 14-15).  According to Plaintiff's affidavit, Lowy told Plaintiff he had also spoken to Warden Pierce.  (Doc. 181, p. 1).  In addition, Plaintiff's grievances were routed by Warden Pierce.  According to Warden Pierce's affidavit, he is not a medical professional; medical staff are hired by an outside vendor; he does not have authority to send inmates to outside medical facilities for non-emergency conditions; and he does not have authority to amend policies set forth in Administrative Directives.  (Doc. 150-3, p. 3).  Pierce's affidavit also indicates a designee responds to inmate grievances.  (Doc. 150-3, p. 3).

---

[2] Insofar as Plaintiff references a contract between the IDOC and Wexford Health Sources, Inc. (Doc. 173-4, pp. 2-13), that contract is irrelevant to this action, in that it pertains to the time period between 2006-2008.

Again, the causal connection suggested by Plaintiff is far too attenuated for Eighth Amendment liability to attach. Negligent hiring practices and/or policy decisions are insufficient to sustain Eighth Amendment liability. Furthermore, there is no evidence that Plaintiff brought these hiring issues to Warden Pierce's attention and linked them to his allegedly deficient medical care. Therefore, defendant Pierce is entitled to summary judgment on Count 5.

### 3.    Christine Mitchell Brown

Defendant Christine Mitchell Brown is the Health Care Administrator at Pinckneyville Correctional Center. Again, as with Director Snyder and Warden Pierce, Plaintiff argues that Christine Mitchell Brown had the authority by virtue of her position, to make staffing changes and related decisions that could have ensured Plaintiff received needed medical care and physical therapy from qualified professionals. (Doc. 143-2, pp. 7-8). According to Plaintiff, Brown controls the healthcare budget at Pinckneyville and can order that Plaintiff receive physical therapy outside the prison. (Doc. 143-2, p. 8). Brown is a registered nurse, as well as Healthcare Administrator. (Doc. 150-3, p. 5). According to her affidavit, absent a doctor's order, she does not have the authority to order Plaintiff to be treated by an outside physical therapist, and she has no authority to override a doctor's order or change institutional policies. (Doc. 150-3, pp. 5-6).

As previously discussed in a separate order relative to Dr. Garcia, the physician at Pinckneyville principally involved with Plaintiff, questions of fact remain that preclude summary judgment relative to Dr. Garcia. Nevertheless, with respect

to defendant Christine Mitchell Brown, the evidence is clear that she did not control treatment decisions (onsite or offsite); her tangential administrative decisions are too attenuated to establish Eighth Amendment liability, which requires deliberate indifference. Therefore, Christine Mitchell Brown is entitled to summary judgment on Count 5.

### 4.    Tyrone Murray

Defendant Tyrone Murray was responsible for reviewing and making recommendations regarding grievances at Pinckneyville Correctional Center. (Doc. 143-3, p. 7). According to Plaintiff, as a grievance officer, Murray relayed information to Assistant Warden McKinney and Warden Pierce, otherwise, he was a "minor player." (Doc. 143-2, pp. 5-6). Murray is not a medical professional. (Doc. 143-3, p. 7). Murray explains that when considering grievances regarding healthcare issues, he would consult with Health Care Unit staff for relevant information, but he had no power to do anything beyond making a recommendation; he has no role in Plaintiff's medical care or related staffing decisions. (Doc. 143-3, pp. 7-8). Clearly, Plaintiff has failed to allege or substantiate an Eighth Amendment violation by defendant Murray, who had no role whatsoever in Plaintiff's healthcare or related staffing decisions. Therefore, defendant Murray is entitled to summary judgment relative to Count 5.

### 5.    Scott Wyciskalla

Plaintiff alleges Pinckneyville Correctional Officer Scott Wyciskalla interfered with his access to prescribed Baclofen. (Doc. 173, p. 1; Doc. 173-3, p. 2).

Plaintiff simultaneously states, "Wyciskalla is not alleged to violate Plaintiff's medical claims." (Doc. 173-2, p. 4). However, Plaintiff describes Wyciskalla's alleged wrongful behavior stems from his failure or refusal to get an ADA attendant to assist Plaintiff out of bed and to get his medication (Baclofen), and issuing Plaintiff a false disciplinary ticket. (Doc. 173-3, p. 7; Doc. 181, p. 2).

According to Correctional Officer Wyciskalla's affidavit, he did not prevent Plaintiff from receiving his medication, and he has no role in determining what medical care Plaintiff received. (Doc. 150-3, p. 7). Plaintiff appears to have abandoned any claim against Wyciskalla related to the termination of Baclofen, instead attributing any unconstitutional action taken by Wyciskalla to his claims retaliation and harassment, as pled in Count 9. In any event, there is no evidence or suggestion that Correctional Officer Wyciskalla has any authority over whether Plaintiff received Baclofen, and as discussed in a separate order regarding Dr. Garcia, the factual dispute regarding Plaintiff not receiving Baclofen between October 16 and November 10, 2000, centers around whether Dr. Garcia cancelled the prescription or whether Plaintiff refused the medication– neither scenario involving defendant Wyciskalla. Therefore, defendant Wyciskalla is entitled to summary judgment relative to Count 5.

**6.    Roger Cowan**

Defendant Roger Cowan is the warden at Menard Correctional Center. As Plaintiff argued relative to Warden Pierce, Plaintiff contends Warden Cowan, although not a medical professional, had authority to make staffing changes and

related decisions that could have ensured Plaintiff received needed medical care (including an egg crate mattress) and physical therapy from qualified professionals. (Doc. 143-2, pp. 7-8; Doc. 173-2, pp. 2-4).  According to Warden Cowan's affidavit, he is not a medical professional; medical staff are hired by an outside vendor; he does not have authority to send inmates to outside medical facilities for non-emergency conditions; and he does not have authority to amend policies set forth in Administrative Directives.  (Doc. 150-3, pp. 1-2).

Again, the causal connection suggested by Plaintiff is far too attenuated for Eighth Amendment liability to attach.  Negligent hiring practices and/or policy decisions are insufficient to sustain Eighth Amendment liability.  Furthermore, there is no evidence that Plaintiff brought these hiring issues to Warden Cowan's attention and linked them to his allegedly deficient medical care.  Therefore, defendant Cowan is entitled to summary judgment on Count 11.

### 7.    Alan Frentzel

Plaintiff alleges Menard's Assistant Warden of Programs, Alan Frentzel, by virtue of his administrative position, had authority to make staffing changes and related decisions that could have ensured Plaintiff received needed medical care and physical therapy from qualified professionals.  (Doc. 173-2, pp. 3-6; Doc 173-3, pp. 26-27).  According to Frentzel's affidavit, he is not a medical professional; he had no role in decisions regarding Plaintiff's medical care; he has no authority to order treatment offsite in non-emergency situations; he has no authority to amend policies set forth in Administrative Directives; and he has no authority to hire a physical

therapist.  (Doc. 143-3, pp. 12-13).  Frentzel is yet another administrative official whose connection to the alleged denial of medical care is too attenuated for Eighth Amendment liability.  Therefore, defendant Frentzel is entitled to summary judgment relative to Count 11.

### 8.    Pam Grubman

Plaintiff alleges the Health Care Unit Administrator at Menard Correctional Center, Pam Grubman, had authority to send Plaintiff to an outside physical therapist, but failed to do so.  (Doc. 173-3, p. 27).  Grubman, a registered nurse, cannot prescribe treatment or override doctors' treatment decisions; she did not personally participate in Plaintiff's treatment, although she reviewed his medical records in relation to grievances he filed; no physician at Menard ordered physical therapy; she has no authority to change institutional policies; she had no authority to hire a physical therapist or transfer Plaintiff to an outside facility for physical therapy.  (Doc. 143-4, pp. 1-3).

The evidence is clear that Grubman did not control treatment decisions (onsite or offsite), and tangential administrative decisions are too attenuated to establish Eighth Amendment liability, which requires deliberate indifference.  Again, Plaintiff has reached beyond the physicians who, by all accounts, were in charge of all treatment decisions, which dictate what onsite and offsite options are used. Therefore, Pam Grubman is entitled to summary judgment on Count 11.

9.    **Mavis Gross**

Defendant Mavis Gross is a grievance officer at Menard Correctional Center and is named as a Defendant in Count 11.  However, Plaintiff's Reply to the subject motion indicates she is not a subject of the "medical counts," which would include Count 11.  (Doc. 173-2, p. 7).  Plaintiff's affidavit, deposition testimony and reply to the subject motion do not otherwise discuss Gross's involvement in Plaintiff's medial care.

According to Gross's affidavit, she is not a medical professional.  (Doc. 143-11, p. 7).  Gross explains that when considering grievances regarding healthcare issues, she would consult with Health Care Unit staff for relevant information, but she had no power to do anything beyond making a recommendation; she has no role in Plaintiff's medical care or related staffing decisions.  (Doc. 143-11, pp. 7-8). Clearly, Plaintiff has failed to allege or substantiate an Eighth Amendment violation by defendant Gross, who had no role whatsoever in Plaintiff's healthcare or related staffing decisions.   Therefore, defendant Gross is entitled to summary judgment relative to Count 11.

B.    **Negligence Claims**

Counts 7 and 13 allege that the aforementioned medical care or lack thereof constituted reckless negligence under Illinois law.  Count 7 pertains to the time period Plaintiff was housed at Pinckneyville Correctional Center, April 6, 2000 - February 6, 2001, and is specific to defendants Warden Guy Pierce, Health Care Administrator Christine Mitchell Brown, Correctional Officer Scott Wyciskalla and

Leisure Time Activity Specialist Tyrone Murray, as well as IDOC Director Donald Snyder. Count 13 pertains to the time period Plaintiff was housed at Menard Correctional Center, February 6, 2000 - December 6, 2002, and is specific to defendants Warden Roger Cowan, Assistant Warden Alan Frentzel, Health Care Unit Administrator Pam Grubman and Correctional Clerk Mavis Gross, as well as IDOC Director Donald Snyder.

Under Illinois law, in a negligence action, the plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the Plaintiff incurred injuries proximately caused by the breach. *See Velarde v. Illinois Cent. R.R. Co.*, **820 N.E.2d 37, 51 (Ill. App. Ct. 2004).** In support of their affirmative defense, Defendants cite to *Turner v. Miller*, **301 F.3d 599, 602 (7th Cir. 2002)**, noting that sovereign immunity bars consideration of these two claims. Tort claims arising out of a state employee's breach of a duty that is imposed on him solely by virtue of his state employment may only be brought in the Illinois Court of Claims. *Turner*, **301 F.3d at 602.** Unlike co-defendants Drs. Garcia, Feinerman and Doughty, none of the aforementioned Defendants are alleged to have been acting as medical professionals; rather, they were carrying out general administrative duties within the prison(s). A correctional employee's duty to provide for the safety of inmates arises solely from that individual's status as a state employee. *Id.* Therefore, sovereign immunity prevents such claims from being entertained in this Court and Counts 7 and 13 must be dismissed without prejudice.

Plaintiff's response to the subject motions does not address this argument; Plaintiff's silence on the issues will be taken as a concession to the validity of this point.

## C.     The Remaining Rehabilitation Act Claim

Counts 8 and 16 invoke the Rehabilitation Act, **29 U.S.C. § 794**. Count 8, pertaining to Pinckneyville Correctional Center, was previously dismissed by the Court as to defendant IDOC, (Doc. 118), but the Court noted that Rehabilitation Act claims still remain against Dr. Garcia (*see* Doc. 182, p. 2, n.1), and defendants Snyder, Mitchell, McKinney, and Pierce (*see* Doc. 1, p. 69, ¶ 97). Count 16 pertains to Menard Correctional Center and defendants Snyder, Cowan, Grubman, Frentzel, Knop, Rea, and IDOC, as well as defendants Walls and Dr. Feinerman, who have not moved for summary judgment as to this Count. (*See* Doc. 1, pp. 105-112, ¶¶ 207-215; Doc. 118, pp. 8-10).

The Rehabilitation Act provides, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." **29 U.S.C. § 794(a)**. "An otherwise qualified person is one who is able to meet all of a program's requirements *in spite of his handicap*." ***Southeastern Community College v. Davis*, 442 U.S. 397, 406 (1979) (emphasis added)**. The "otherwise qualified" requirement means that Plaintiff must show that, *were it not for his handicap*, he would have qualified for the benefit, treatment, or program

which he was denied.  ***Grzan v. Charter Hospital of Northwest Indiana*, 104 F.3d 116, 120-21 (7th Cir. 1997) (emphasis added)**.  The Rehabilitation Act is "materially identical to and the model for the ADA [citation omitted] except that it is limited to programs that receive federal financial assistance." ***Crawford v. Indiana Department of Corrections*, 115 F.3d 481, 483 (7th Cir. 1997), *abrogated on other grounds*, *see Erickson v. Board of Governors of State Colleges and Universities*, 207 F.3d 945, 948-49 (7th Cir. 2000)**.

As to Plaintiff's remaining Rehabilitation Act claims alleged in Count 8, the Court dismisses these for the same reason it dismissed the claims against IDOC (*see* Doc. 118): Plaintiff fails to properly plead the requisite elements for a Rehabilitation Act claim.[3]  Namely, Plaintiff can not show he is "otherwise qualified" for the programs he said he was denied access to, "solely by reason of . . . his disability."  In other words, Plaintiff alleged defendants Garcia, Snyder, Mitchell, McKinney, and Pierce denied him access to physical and occupational therapy, physical therapy facilities, certain prescription medication, a proper prosthetic device, a properly functioning wheelchair and access to a neurosurgeon.  These "programs" were not something Plaintiff would be allowed to participate in if he was not disabled in the first place – therefore, it is impossible to plead that he was denied access solely because of his disability.  ***See Grazan v. Charter Hosp. of Northwest***

---

[3]  The Court notes that defendant Dr. Garcia is not a movant in the instant motions for summary judgment, so the Court's dismissal of Plaintiff's claim against Dr. Garcia in Count 8, for violation of the Rehabilitation Act, is *sua sponte*.

***Ind.*, 104 F.3d 116, 119 (7th Cir. 1997)**.

In Count 16, Plaintiff takes issue with the following: the adequacy of the shower chair provided; delays in sick-call screening for disabled persons; the lack of a wheelchair-accessible segregation visiting room; lack of a wheelchair-accessible restroom on the segregation yard used by disabled inmates; lack of a wheelchair-accessible van for transportation; the use of shackles that impede or prohibit Plaintiff from wearing wrist and ankle splints; and lack of ramps on all wings, thereby limiting mobility in case of fire; and the denial of assistance typing his legal documents when non-handicapped inmates have access to typewriters in the prison library. Citing ***Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492, 1494 (10th Cir. 1992)**, Defendants argue that Plaintiff again fails to meet the requisite elements to plead valid claims for violations of the Rehabilitation Act because: (1) the issues he raises in Count 16 describe "programs" that apply solely due to his handicap – not in spite of it; and (2) evidence shows Plaintiff was not discriminated against, but rather, Defendants accommodated for Plaintiff's disability (Doc. 143, pp. 13-14; Doc. 150, pp. 13-14).

Defendants are correct in that one of Plaintiff's alleged "violations" in Count 16 refers to a medical benefit for which Plaintiff would not have qualified *but for* his handicap. Specifically, the Court is referring to Plaintiff's allegation that he was denied use of his wrist and ankle splints in violation of the Act. Similar to his claims in Count 8, this claim must fail, as Plaintiff cannot show, nor has he plead,

that he would otherwise have qualified for the use of the splints if not for his physical impairments.  Therefore, Defendants are entitled to a partial summary judgment in this regard.

Insofar as Plaintiff complains that he was not offered assistance in typing legal documents, Defendants question whether this service is a program or activity for purposes of the Act.  The complaint alleges that Defendants "refused to provide reasonable and meaningful access to his (Plaintiff's) typewriter . . . . Although M.C. law library has typewriters or has staff to type legal documents for healthy inmates, but not the disable[d] inmates." (Doc.1, 111, ¶ 209(H)).  Plaintiff's response to the subject motions makes no mention of the typing. (Doc. 173-3, pp. 13-20).  According to the affidavit of Paralegal Assistant Elisa Rea, inmates are provided access to legal research, including case law, as well as paper, pen and envelopes. (Doc. 143-11, p. 4).  Paralegal assistants visit the ADA segregation unit, as inmates housed in that unit typically do not come to the law library.  (Doc. 143-11, p. 4).  Plaintiff does not indicate he is precluded from going to the library because of his handicap.  One of Plaintiff's chief complaints is that Rea refused to give him typing paper in retaliation for Plaintiff filing grievances, which when taken together with Plaintiff's complaint that he was not provided with reasonable access to his own typewriter, indicates Plaintiff would not be "otherwise qualified" for any typing assistance program that may exist.  Documentation regarding a grievance over access to a typewriter indicates Plaintiff had failed to show library staff he was required to have his legal papers typed.  (Doc. 1, pp. 137 and 180).  Plaintiff has

likewise failed at this juncture to show he qualified for any such typing assistance or access to a typewriter.

As for the remaining violations of the Act Plaintiff describes in Count 16, Defendants mistakenly believe that the provided accommodation is, in fact, the "program or activity" itself. For example, Plaintiff complains of the inadequacy of the shower chair provided by Defendants. Defendants argue that Plaintiff would not qualify for the use of the shower chair if he were not handicapped and thus, there is no valid claim. Yet, this is not the same as the "violations" Plaintiff described in Count 8. Instead, the "program or activity" which Plaintiff is allegedly being denied is the right to use the shower facilities. **See, e.g., Cooper v. Weltner, No. 97-3105-JTM, 1999 WL 1000503 at \*6 (D. Kan. Oct. 27, 1999) (Marten, J.) (unpublished opinion)**. Under the Rehabilitation Act, Defendants are required to provide reasonable accommodations. It is clear from the record that an accommodation was provided – what remains a question of material fact is whether it can be considered "reasonable." **See Crawford, 115 F.3d at 483 (if the plaintiff is disabled and claims he was denied access to program or activity for which he was otherwise if not for his handicap, the defendant must show there was no reasonable accommodation that would have enabled the plaintiff to participate or that accommodation would place an undue burden on the prison)**. Defendants have not met their burden of proof, as movant, to show that it was.

The remainder of the alleged Rehabilitation Act violations stated in

Count 16 are that Defendants have caused severe delays in the sick-call screening for disabled individuals which caused Plaintiff delay in getting medical attention. Plaintiff also states that because the segregation visitation room is not wheelchair accessible, he is forced to cram his wheelchair into a small space, which allegedly causes him excruciating pains.  Additionally, Plaintiff claims that the prison transport vans are not wheelchair accessible and therefore, when he is being transported, he is made to lie on the floor of the van, which has caused him physical injury and suffering.  The restroom facilities in the segregation exercise yard is also not wheelchair accessible.  When Plaintiff needed to use the restroom, he had to be carried there by a correctional officer, who allegedly refused to bring Plaintiff back out to the yard afterward, thereby Plaintiff lost the remainder of his exercise hour. Lastly, Plaintiff complains that there are no wheelchair ramps on the "North II Annex Building Fourth Floor" where he was housed, which made it impossible for wheel-chair bound inmates to evacuate to another floor, as did the non-handicapped inmates, during a fire alarm.  (*See* Doc. 1, pp. 106-111).

Again, these alleged violations are not the "programs or activities" themselves, but are merely what Plaintiff believes are shortcomings of the programs or activities for which he is otherwise qualified.  To explain, there is no argument as to whether Plaintiff is considered a handicapped individual.  In this instance, he sole disputed issue is whether these accommodations can be considered reasonable.  No resolution is apparent at this point – the Court finds questions of material fact remain, prohibiting summary judgment as to these issues.

Accordingly, defendants IDOC, Synder, Cowan, Grubman, Frentzel, and Knop are entitled to a partial summary judgment on Count 16 as to Plaintiff's claims of denial of the use of wrist and ankle splints and denial of typing assistance *only*. However, from the Record, Plaintiff's denial of typing assistance claim is the only one in Count 16 pertaining to Paralegal Assistant Rea and thus, summary judgment as to Count 16 will be granted in her favor.

**D.     The Retaliation Claims**

Counts 9 and 17 allege that Plaintiff was subjected to retaliation and harassment in violation of the First Amendment.  Count 9 pertains to when Plaintiff was housed at Pinckneyville Correctional Center, and is brought against defendant Wcyiskalla.  Count 17 pertains to the time period Plaintiff was housed at Menard Correctional Center, and it is brought against defendants Paralegal Assistant Elisa Rea and Warden Roger Cowan.

> An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution.  Prisoners have a constitutional right of access to the courts that, by necessity, includes the right to pursue the administrative remedies that must be exhausted before a prisoner can seek relief in court.  Thus, a prison official may not retaliate against a prisoner because that prisoner filed a grievance.  This is so even if the adverse action does not independently violate the Constitution.

***DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) (citations omitted)**.

To establish a claim of retaliation for exercising free speech, an inmate must allege a chronology of events from which retaliation can be inferred, and prove both that his grievances were the motivating factor behind the defendant's conduct,

and that things would have transpired differently absent the retaliatory motive. *Hasan v. Department of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996).

### 1.    Scott Wyciskalla

According to Plaintiff, around or about June 2000, Pinckneyville Assistant Warden McKinney characterized Plaintiff as being a litigious "troublemaker," and McKinney commented that she would ensure her officers made the life of any troublemaker a living hell.  (Doc. 181, p. 1).  Thereafter, various correctional officers allegedly retaliated against Plaintiff, including Correctional Officer Scott Wyciskalla, who supposedly wrote Plaintiff a fabricated disciplinary ticket in October 2000.  (Doc. 173-3, pp. 5-7).  Plaintiff also links the disputed disciplinary charge to his oral complaints that Wyciskalla failed to have an ADA attendant assist Plaintiff to the medical line to obtain a prescription.  (Doc. 173-3, p. 7; Doc. 181, p. 2).  The disciplinary ticket was ultimately expunged.  (*See* Doc. 1, p. 236).  According to Correctional Officer Wyciskalla's affidavit, he did not prevent Plaintiff from getting his prescription in October 2000, nor did he harass or retaliate against Plaintiff as alleged.  (Doc. 150-3, pp. 7-8).  The trier of fact must determine whom to believe; questions of fact remain that preclude summary judgment on this aspect of Count 9.

##### 2.     Roger Cowan

Menard's Warden Roger Cowan allegedly retaliated against Plaintiff by condoning Paralegal Assistant Elisa Rea's harassment of Plaintiff.  **(Doc. 1, pp. 114, ¶ 223).**  Plaintiff's affidavit, response to the subject motion and the excerpts of his deposition add nothing to that assertion.  The only thing possibly connecting Warden Cowan to any retaliation or harassment or any of the wrongs alleged in the complaint is that Plaintiff filed grievances which procedurally work their way through the Warden's office.

"The doctrine of respondeat superior does not apply to § 1983 actions; thus to be held individually liable, a defendant must be 'personally responsible for the deprivation of a constitutional right.'" ***Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001),** *quoting **Chavez v. Ill. State Police,* 251 F.3d 612, 651 (7th Cir. 2001); *see also **Monell v. Department of Social Services,* 436 U.S. 658 (1978); *Eades v. Thompson,* 823 F.2d 1055, 1063 (7th Cir. 1987); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983); *Duncan v. Duckworth,* 644 F.2d 653, 655-56 (7th Cir. 1981).**  Supervisory officials may be liable for the constitutional torts of their subordinates *if* the supervisor knows of and facilitates, approves, condones, or turns a blind eye to the conduct. ***Chavez v. Cady,* 207 F.3d 901, 906 (7th Cir. 2000); *Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir. 1988).**  According to Warden Cowan's affidavit, he did not retaliate against Plaintiff nor did he direct anyone else to do so.  (Doc. 150-3, p. 2).  Such a bald

accusation of retaliation, that is not even substantiated by Plaintiff's own affidavit, does not even create question of fact for resolution.  Therefore, Warden Cowan is entitled to summary judgment on Count 17.

**3.    Elisa Rea**

Paralegal Assistant Elisa Rea allegedly retaliated against Plaintiff for filing grievances against her and others.  According to Plaintiff, Rea told Plaintiff she had heard Plaintiff was a troublemaker, and she remarked that troublemakers get what they have coming to them.  (Doc. 181, p. 2).  In the weeks and months to come, Rea denied Plaintiffs requests for supplies and assistance needed to pursue Plaintiff's grievances and litigation.  (Doc. 181, pp. 2-4).  According to Plaintiff, Rea made an assortment of comments reflecting that she was "not in the business of giving legal supplies" and she was sick and tired of Plaintiff filing grievances against her, and also threatening to make a disciplinary charge that could cost Plaintiff his television privileges.  (Doc. 181, pp. 2-4).

According to Rea's affidavit, although she was aware Plaintiff had filed grievances, she did not retaliate against him or direct others to do so.  (Doc. 143-11, pp. 4-5).  Rea argues that Plaintiff's 248 page complaint belies his assertions that Rea denied him access to legal supplies and assistance in his litigation efforts.  Rea further contends the issuance of two disciplinary tickets does not constitute a chronology of events from which retaliation can be inferred.  Plaintiff's affidavit reiterates a chronology of events beginning in April 2001 and continuing through

January 2002, which includes statements allegedly made by Rea that suggest a retaliatory intent, followed by denial of writing supplies, and services and the issuance of disciplinary tickets.  (Doc.181, pp. 2-4).  This chronology of events sufficiently frames a First Amendment claim, and the remaining questions of fact preclude summary judgment as to Count 17.

## V.  <u>CONCLUSION</u>

The Motion for Summary Judgment filed by defendants Illinois Department of Corrections, Alan Frentzel, Mavis Gross, Pam Grubman, Gary Knop, Tyrone Murray, and Elisa Rea (Doc. 142) is hereby **GRANTED IN PART AND DENIED IN PART**.  More specifically:

1.  The Illinois Department of Corrections is granted partial summary judgment on Count 16 as to Plaintiff's claims of Rehabilitation Act violations for denials of wrist and ankle splints and typewriting assistance, only.  IDOC must proceed to trial on Plaintiff's remaining claims of Rehabilitation Act violations in Count 16.

2.  Donald Snyder is granted summary judgment on Counts 5 and 11 and is granted partial summary judgment on Count 16 (as to claims for denials of splints and typewriter assistance); Plaintiff's surviving claims of Rehabilitation Act violations pled in Count 16 remain against Snyder and will proceed to trial.

3.  Alan Frentzel is granted summary judgment on Count 11 and partial summary judgment as to Count 16 (as to claims for denials of splints and typewriter assistance); Plaintiff's surviving claims of Rehabilitation Act violations pled in Count 16 remain against Frentzel and will proceed to trial.

4.  Mavis Gross is granted summary judgment on Count 11; no additional claims remain against Gross.

5.    Pam Grubman is granted summary judgment on Count 11 and partial summary judgment as to Count 16;(as to claims for denials of splints and typewriter assistance); Plaintiff's surviving claims of Rehabilitation Act violations pled in Count 16 remain against Grubman and will proceed to trial.

6.    Gary Knop is granted partial summary judgment on Count 16 (as to claims for denials of splints and typewriter assistance); Plaintiff's surviving claims of Rehabilitation Act violations pled in Count 16 remain against Knop and will proceed to trial.

7.    Tyrone Murray is granted summary judgment on Count 5; no additional claims remain against Murray.

8.    Elisa Rea is granted partial summary judgment on Count 16 (as to claims for denials of splints and typewriter assistance); Plaintiff's surviving claims of Rehabilitation Act violations pled in Count 16 remain against Rea and will proceed to trial; further, Rea is denied summary judgment and must therefore proceed to trial on Count 17.

Moreover, the Court finds that the negligence claims, plead in **Counts 7 and 13** of Plaintiff's Complaint, are barred by the doctrine of sovereign immunity and must therefore be **DISMISSED WITHOUT PREJUDICE** as to the moving Defendants, stated herein (Docs. 142 & 149).  As such, these claims will not proceed to trial for any of the moving Defendants.

Additionally, the Motion for Summary Judgment filed by defendants Roger Cowan, Guy Pierce, Christine Mitchell Brown, and Scott Wyciskalla (Doc. 149) is hereby **GRANTED IN PART AND DENIED IN PART**.  More specifically:

1.    Roger Cowan is granted summary judgment on Counts 11 and 17; Cowan is granted partial summary judgment on Count 16 (as to claims for denials of splints and typewriter assistance); Plaintiff's surviving claims of Rehabilitation Act violations pled in Count 16 remain against Cowan and will proceed to trial;

2.    Guy Pierce is granted summary judgment on Count 5; no additional claims remain against Pierce;

3.    Christine Mitchell Brown is granted summary judgment on Count 5; no additional claims remain against Mitchell Brown;

4.    Scott Wyciskalla is granted summary judgment on Count 5; however, Wyciskalla is denied summary judgment and must therefore proceed to trial on Count 9.

**IT IS SO ORDERED.**

Signed this 27th day of March, 2008.


/s/    David R Herndon

**Chief Judge**
**United States District Court**